[No. 22463. *En Banc.* May 29, 1930.]

H. M. JONES, *Appellant,* v. THE CITY OF CENTRALIA, *et al., Respondents.*[1]

[1]Reported in 289 Pac. 3.

*Cleland & Clifford* and *C. D. Cunningham,* for appellant.

*J. H. Jahnke, Preston, Thorgrimson & Turner,* and *Yantis & Brodie,* for respondents.

*Roberts, Skeel & Holman, amicus curiae.*

BEALS, J.—Plaintiff instituted this action, on behalf of himself and all other persons similarly interested, against City of Centralia, a municipal corporation, the mayor and city commissioners of Centralia, and the other defendants as persons having some special interest in the subject-matter of the litigation, for the purpose of obtaining a decree declaring the proceedings of the defendants city commissioners, taken with the view of establishing a hydro-electric plant, system

and development as a municipal property, invalid, and for the purpose of procuring a judgment to the effect that the city treasury be reimbursed for certain expenditures made therefrom on account of the purchase, construction or installation of the plant above referred to.

A brief statement of the facts leading up to the bringing of this lawsuit is necessary to an understanding of the present situation. The city of Centralia has for a period of years owned and operated an electric current distributing system, by which it distributed within the city, for its own use and for sale to private users, electric current which it purchased from private producers. The city commissioners, deeming it advisable that the city acquire a plant for the production of its own electric current, by ordinance No. 646, called a special municipal election for February 25, 1929, at which the voters of the city should pass upon a proposed plan or system, which, if adopted, should provide for the acquisition of necessary property rights incident thereto and for the construction of a hydro-electric producing plant. The plan, as submitted to the voters, also provided for the issuance of $650,000 in special utility bonds, to cover a portion of the cost of the plant. At this time the city had in its treasury approximately $300,000, which it had derived from the earnings of its electric current distribution system, which fund it was proposed should also be used in paying for the new plant.

The election was held as scheduled, a majority of the voters exceeding the number required by law voting in favor of the adoption of the proposition, and the city commissioners forthwith proceeded to obey the mandate of the electors of their city and entered into contracts and expended money with the purpose of constructing the plant and placing the same in con-

dition to deliver electric current to the city's distributing system as already constructed. Thereafter, in an action instituted by an elector and taxpayer of the city, the special election above referred to was held illegal because of insufficient notice thereof. *Dunn v. Centralia,* 153 Wash. 495, 280 Pac. 26.

Work upon the plant was proceeding when this action was commenced, and at the time of the trial below, defendant Fisher, a contractor, had practically completed the dam near the site of the proposed plant, and had performed much work upon the canal required by the plans, as adopted by the commissioners.

After the filing of the opinion of this court in the case of *Dunn v. Centralia, supra,* the city commissioners passed ordinance No. 658, which purported to adopt the plan as it had been originally adopted by the city commissioners and the electors, which ordinance contained a further provision as follows:

"That as part of such system and plan said city adopts and ratifies all those certain contracts heretofore entered into by said city for the construction of said diversion dam, headworks and canal, and the purchase and installation of the machinery, equipment and appliances for said hydro-electric power plant, including all obligations attempted to be incurred under said contracts and all work done and to be done, and all payments made and to be made thereunder."

An election was called pursuant to this ordinance for September 30, 1929, in which there was submitted to the electors of the city a proposition in form as follows:

"Shall ordinance No. 658, passed September 3, 1929, be ratified, and the city of Centralia, Washington, pursuant to the plan specified and adopted by said ordinance, purchase, acquire and construct a hydro-electric power plant, diversion dam, head works, canal, transmission line, sub-station, and appurtenances and

additions to the present light distribution system of said city, estimated to cost $955,000, and as a part of such plan to adopt and ratify those certain contracts heretofore entered into by said city for the construction of the diversion dam, head works and canal, and the purchase and installation of the machinery for said hydro-electric power plant, and for the purpose of paying therefor to issue its special revenue bonds in the sum of $650,000, payable solely from the revenues of said light and power system, serially in from five to nineteen years, with interest not exceeding 6% per annum, and pay the balance of such cost out of moneys, securities and gross earnings of said light and power system, all as provided in said ordinance No. 658;''

the voters being given an opportunity to vote either in favor of or against the proposition as stated. The electors expressed themselves as in favor of the adoption of the proposition by a vote of 1,600 for and 223 against. October 1, 1929, the city commissioners, by resolution, ratified all of the contracts theretofore entered into for the purpose of constructing the electric plant, whereupon this action was instituted. While this cause was pending in the court below, the city commissioners passed ordinance No. 662, reciting the passage of the original ordinance providing for the acquisition of the plant, the submission of the same to popular vote and its adoption by the voters, the decision of this court holding the election invalid, the passage of ordinance No. 658, its submission to the people at a special election and the adoption by the voters of the proposition as submitted, that the legality of the proceedings was once more under attack for the reason, among others, that the estimates for the work had not been included in the 1929 budget, that it was proposed that the cost of the project should be borne solely out of the special fund created by the hydro-electric distribution system and by the

sale of bonds payable only out of a special fund, that the work was in process of completion and that an emergency existed, a budget emergency being declared. A supplemental answer was filed, in which the passage of ordinance No. 662 was pleaded.

Thereafter the plaintiff herein instituted another action, setting up substantially the same allegations as are contained in his complaint in this cause, with the addition of allegations reciting the passage of ordinance No. 662, alleging that this latter ordinance was invalid, and praying for an injunction against the same. To this complaint in the second cause of action, an answer was filed containing admissions, denials and an affirmative defense, together with a prayer that the two actions be consolidated for trial or the second action dismissed.

Thereafter, and just prior to the commencement of the trial of this action, the superior court, over plaintiff's objection, entered an order dismissing the second action, holding that the issues therein would be determined upon the trial of this cause, from which order plaintiff has prosecuted an appeal. Thereafter this suit proceeded to trial, and, after a full hearing, the court ruled against plaintiff on all the issues and entered a judgment of dismissal, from which plaintiff appeals.

It appears that, during the month of December, 1928, the city officials, assuming to act on behalf of the city, entered into an agreement in writing with respondent Pacific Development Company, with a view to the purchase by the city of water rights on the Nisqually river in Thurston county for a consideration of $125,000, making a down payment from the city treasury in the sum of $5,000; that, later, and prior to the election of September 30, 1929, the commissioners made further payments aggregating $70,000 on ac-

count of the purchase of the water rights; that, during the month of May, 1929, the commissioners entered into a written contract with respondent Elza T. Fisher for the digging of a canal, between nine and ten miles in length, at an agreed price of a little less than $90,000, and that the commissioners later contracted with respondent Fisher for the construction of a dam and incidental labor and material at the price of something over $75,000, and that large payments were made on account of these contracts.

Two of the original defendants in the action, with whom contracts had been entered into, were dismissed therefrom after they answered, it appearing that they had neither furnished material under their contracts nor received any money on account thereof.

After the enactment by the city commissioners of ordinance No. 658, above referred to, which, among other things, called a municipal election for September 30, 1929, the city commissioners expended city funds in an advertising campaign in order, as they say, to advise the electors of the city as to the situation concerning the different matters comprising the proposition upon which the voters were called upon to express their will, or, as contended by appellant, in an endeavor to procure a majority vote in favor of the different propositions which were to be submitted as one proposition to the voters for acceptance or rejection, which money was so expended for newspaper advertising, the distribution of placards, show-house publicity, personal solicitation by paid employees of the city, and in the transportation of voters by automobiles to the site of the proposed plant, all of which expenditures appellant contends were illegal and without warrant of law.

Prior to the election of September 30, 1929, the city commissioners had expended approximately $278,000

of the fund in the city treasury representing the profits earned by the city from the sale of electrical energy through its distributing system.

Appellant assigns error upon the refusal of the trial court to strike portions of the answers and amended answers of three of the respondents, upon the order of the trial court overruling appellant's demurrers to affirmative defenses contained in respondents' answers, and upon the order of the court in denying appellant's motions to strike respondents' supplemental answers and in overruling appellant's demurrers to these answers.

Appellant also complains of the refusal of the trial court to receive evidence offered by appellant to the effect that the proposed development is far in excess, not only of the present needs of the city, but of any future needs which are within the bounds of reasonable anticipation, and that the plan or system therefore constitutes a fraud upon the taxpayers of the city, and finally that the court erred in entering judgment against appellant and in favor of respondents.

In support of his contentions, appellant argues:

(1) The contracts and expenditures attacked in this action are null and void because never authorized in the manner provided by law.

(2) The election by which ratification was attempted is without force or effect.

(3) Each and every defense interposed by respondents is no defense whatever to appellant's causes of action.

(4) The superior court should have received evidence offered by appellant showing or tending to show that the proposed development is far in excess of not only the present but the reasonably anticipated future needs of the city, and is therefore a fraud upon the taxpayers.

The "proposition," as submitted to the voters September 30, 1929, stated that the estimated cost of the project was $955,000, of which $650,000 should be raised by the sale of bonds payable only from the special fund to be established for that purpose. It appears that, at the time of this election, a considerable portion of the light fund, as theretofore accumulated, had been, by the commissioners, disbursed in carrying out the plan or system as voted in the first election. A substantial sum, however, still remained on hand.

Appellant, in his complaint, includes two causes of action. In the first, he alleges that he is a citizen of the state of Washington, a resident and taxpayer of the city of Centralia, and a user of electrical energy furnished by that city. He further alleges the enactment of ordinance No. 658, a copy of which he attaches to his complaint as an exhibit, and pleads certain facts which he contends render this ordinance void. He further alleges that respondent Fisher had performed work and furnished labor in connection with the construction of the power plant, and that Mr. Fisher had been paid from the city treasury, on account of such work and material, large sums of money, and that existing contracts between respondents Fisher and the city call for further payments, and that other sums are due divers persons under contracts between such persons and the city, providing for the purchase of property and material to be used in the construction of the plant. Then he alleges that the ordinance and the election held pursuant thereto were wholly void, illegal and of no effect.

For a second cause of action, appellant realleges his first cause of action, and that respondents Pacific Development Company and Fisher and other persons had been, by the respondents who are the officials of the city, paid large sums of money, which payments were

illegal and void, and that the respondent city officials made these payments well knowing that they had no authority or right so to do, the purpose of the second cause of action being to state facts which would authorize a judgment requiring the restoration to the treasury of respondent city of the money so paid and of certain other disbursements.

On the trial of the action, it was stipulated that, in so far as contracts had been entered into between the city and respondent Fisher, the contract price for the furnishing of labor and material represented the reasonable value thereof.

The evidence indicates that the money expended by the city commissioners was derived solely from the earnings of the power distributing plant owned by the city, and that no portion thereof represented money raised by general taxation.

In the first place, respondents contend that, in so far as appellant's second cause of action is concerned, appellant has no legal capacity to sue for the return of the money which he alleges was unlawfully disbursed by the city officials. Appellant, being a resident and taxpayer of the city of Centralia and a user of electric current furnished by the city, is interested in the fund which had accumulated from the operation of the power distribution system owned by the city, and has the right to wage an action to prevent any unlawful diversion of the moneys in this fund, in the disposition of which, as a property owner, taxpayer and user of power, he has some interest. Under modern conditions, the use by a city of electric current for lighting its streets vitally affects all property owners and residents of the city, and the cost of current furnished to private houses for domestic use might well be held a substantial element which affects both rental and property values. Those who pay for the electrical

energy are certainly interested in the fund which accumulates from profits earned by the city in the sale or distribution of power, as such a fund should be used, in accordance with law, for the purpose of improving the service, reducing rates or in some other manner for the benefit of the patrons of the system, or the city at large.

■ It is, of course, true, as contended by appellant, that any expenditures of money by respondent commissioners prior to the election of September 30, 1929, were without warrant of law, as this court has held that the first election was void because of insufficient notice. The law requires that, before the officers of any city shall enter upon the purchase or construction of such a power plant as that here in question, the proposed action shall be submitted to the voters of the city for ratification or rejection (Rem. Comp. Stat., § 9489, 9041 and 9034, par. 45). Appellant also relies upon Rem. Comp. Stat., § 9042, which reads as follows:

"The city council of such city shall never allow, make valid, or in any manner recognize any demand against the city which was not at the time of its creation, a valid claim against the same, nor shall it authorize to be paid any demand which without such action would be invalid, or which shall then be barred by any statute of limitation or for which the city was never liable, and any such action shall be void."

Appellant argues that none of the expenditures made under direction of the city commissioners prior to the election of September 30, 1929, are susceptible of ratification, and that all contracts made prior to that date are null and void and cannot be ratified by any subsequent acts, either of the city officers or of the voters. Appellant contends that,

". . . if the contracting agency of the municipality does not in the first instance have authority to make the contracts and expenditures and to bind the

municipality, or if there be a statutory prohibition against validation or ratification, then, and in either of those events, any contracts or expenditures which they make or attempt to make are nugatory and completely and absolutely null and void, and there can be no defenses whatever interposed; neither good faith on the part of the contracting agency, estoppel, receipt of benefits, or ratification can prevail against an attack upon such contracts or expenditures.''

As, in the case at bar, it is clear that respondent commissioners had no power to contract for the purchase or construction of such a power plant without a lawful vote by the electors of the city authorizing such action, appellant contends that the acts of respondent commissioners performed pursuant to a void election are absolute nullities, and that no defenses whatever are available to respondents in an action such as this.

Section 9042, Rem. Comp. Stat., *supra,* relied upon by appellant, is not pertinent to the situation here presented. That section means exactly what it says, but it does not prohibit the electors of a city from giving to the legislative body of that city the mandate which the voters of Centralia, at the election of September 30, 1929, directed to respondents, the city commissioners. By this section, city councils are forbidden to allow invalid claims, but they every day pass upon claims for damages, some of which, as a matter of fact, may be ''invalid'' in law in that they are not founded upon facts which would justify any recovery against the city, and yet it would scarcely be contended that a taxpayer could, in an action against the members of the city council, try out the questions of fact as to whether or not the city was actually liable upon an allowed claim, in connection with which the liability of the city depended upon disputed questions of fact.

As to some claims the issues may be clearly drawn, and it may be a simple matter to determine that, as a matter of law, the claim is invalid or barred by a statute of limitation or that the claim is one for which the city was never liable; but there are many claims as to which the liability of the city is doubtful, depending upon questions both of law and of fact, and by this section the city council is not required to arbitrarily reject all such claims and subject the city to numerous and expensive suits. The section, by its terms, does not purport to limit the electors of a city as to any action which they may take upon a matter properly submitted to them, although it may be assumed that their power, acting in their proper sphere, is circumscribed by the same legal limitations as those which limit the city council in its proceedings.

Appellant urges several different grounds upon which he contends it must be held that ordinance No. 658 and the election of September 30 held pursuant thereto are void. It is urged that the ordinance and notice of election and the ballot contained several distinct propositions improperly united as one, and that, because the electors had no opportunity to vote separately upon these propositions, but were required to vote yes or no upon the question as a whole, the election is void. The statement of the proposition as printed on the ballot has heretofore been quoted in full in this opinion. If it be true that, by a single yes or no, the electors were required to vote upon several distinct and unrelated propositions, it may be conceded that the ballot was improper, under the authority of *McBryde v. Montesano,* 7 Wash. 69, 34 Pac. 559, and *Blaine v. Seattle,* 62 Wash. 445, 114 Pac. 164, Ann. Cas. 1912D 315.

The rule of law which prohibits the submission of several distinct and unrelated propositions, united as

one in such a manner as to require the voter to accept or reject all, is salutary and reasonable, and should be enforced. Its purpose is to prevent the joining of several measures in such a manner that each, by rallying to its support those of the voters who desire its adoption, may gather votes for the group of propositions, and cause the popular measures to carry those which are unpopular and which would fail if presented to the voters separately. McQuillin's Municipal Corporations (2nd ed.), vol. 5, p. 1011. In the case of *McBryde v. Montesano, supra,* this court held illegal a ballot stating a proposition to borrow $25,000, of which $20,000 was to be used to pay a prior indebtedness, $3,500 to be employed in the construction of a city hall, and $1,500 in the purchase of fire apparatus. The voters were required to vote yes or no, and the election was held void, the three matters stated in one proposition being entirely different and unrelated.

We cannot follow appellant in his argument based upon these authorities. We deem the question presented upon this branch of the argument governed by the principles laid down by this court in the cases of *State ex. rel. Lowman & Hanford v. Riplinger,* 30 Wash. 281, 70 Pac. 748; *Blaine v. Hamilton,* 64 Wash. 353, 116 Pac. 1076, 35 L. R. A. (N. S.) 577; *Tulloch v. Seattle,* 69 Wash. 178, 124 Pac. 481; *Aylmore v. Hamilton,* 74 Wash. 433, 133 Pac. 1027; *Chandler v. Seattle,* 80 Wash. 154, 141 Pac. 331; *Langdon v. Walla Walla,* 112 Wash. 446, 193 Pac. 1.

We hold that the ballot as presented to the voters embraced but one proposition, and that the same, in requiring the single affirmative or negative expression by the voters, was in accord with law.

Appellant next argues that the ordinance must be held to be unreasonable and void as matter of law, and that this question is one of law for the court

under the case of *Olympia v. Mann,* 1 Wash. 399, 25 Pac. 337, 12 L. R. A. 150. We are convinced that the ordinance is not obnoxious to this objection, as urged by appellant, and we hold that the ordinance cannot be held void in law, as unreasonable in its nature.

We shall now discuss the argument advanced by appellant that, as this court held the first municipal election void by reason of insufficient notice, all the acts of respondent commissioners taken under assumed authority of that vote of the people were, and are, absolutely null and void, and that no subsequent acts, either of the city commissioners or of the electors of the municipality, can adopt or ratify these acts, or any of them, or render them valid or effective for any purpose.

In support of his argument upon this phase of the case, appellant cites several decisions of this court, commencing with the case of *Arnott v. Spokane,* 6 Wash. 442, 33 Pac. 1063. This case arose out of a contract between the city of Spokane, on one part, and Mr. Arnott and an associate, on the other, whereby Mr. Arnott agreed to furnish cut stone to be used by the city in the erection of a bridge. Payments were to be made from time to time as the material was furnished, but, after a few weeks, the city failed to make the payments called for by proper certificates, regularly filed with the proper city official. The plaintiffs continued to furnish stone for two weeks and then suspended operations. Shortly thereafter plaintiffs and the city officials entered into a verbal agreement whereby the plaintiffs agreed to take at par city warrants, which were then selling at ten per cent discount, in lieu of cash, the city officials promising that the city would later pay to plaintiffs in cash the difference between the face value of the warrants and their market value of ninety per cent of par. Plaintiffs then re-

sumed delivery of stone and received warrants therefor in accordance with their agreement with the officers of the city. Plaintiffs also claimed certain extras due to increased cost of operation by reason of the delay occasioned by the city in failing to pay cash in accordance with the original contract. Plaintiffs admitted receiving $850 from the city under the verbal agreement to pay in cash the difference between the face value of the warrants and the market value thereof.

After the completion of the work, plaintiffs sued the city to recover judgment for extra work and material, for damages for breach of contract, and for a balance due. The charter of the city contained a provision to the effect that the city should not be held liable on any contract unless the same was authorized by ordinance, made in writing and, by order of the council, signed by some person authorized by the city to execute the same, none of these formalities having been observed in making the agreement above referred to. Plaintiffs contended that the city had, by its conduct, acquiesced in and ratified the acts of its officers, and that, as plaintiffs contended that the city might originally have made the agreement which its officers did make verbally with plaintiffs, the city had the power to ratify the contract and must be held to have done so. In the course of the opinion, this court said:

"The contention of the appellant [the city] is, that neither the bridge committee nor the mayor had any right or power to bind the city by any agreement or contract not made in writing, and signed by some person duly authorized to execute it. Upon this point we have no doubt of the correctness of appellant's position. While a municipal corporation would, unless restricted by law, have a right to make contracts in reference to its corporate business in any manner it might deem proper, yet, where the mode of contract-

ing is expressly provided by law, no other mode can be adopted which will bind the corporation. . . .

"In fact, so far as we have observed, the authorities are practically uniform on this question. Nor do the respondents appear to seriously dispute this proposition of law, but they contend that the city, by its conduct, acquiesced in and ratified the acts of its officers. The argument is that the city might have originally made the same agreement that its officers made, and hence had the power to ratify it, and must be held to have done so in this instance. But the difficulty arises, not from a want of power in the city to make contracts, but from the restriction imposed upon it by the legislature with reference to the mode of exercising such power. The power to ratify a particular contract presupposes the power to make it in the first instance; and, if it is such that it could not be made originally except in a certain prescribed mode, where that mode is disregarded the power to ratify does not exist. A contract which is invalid because not authorized by law cannot be made valid and binding retroactively by any subsequent action of the corporate body, and a liability be thereby fastened upon the corporation. *Zottman v. San Francisco,* 20 Cal. 97; *Nicholson Pavement Co. v. Painter,* 35 Cal. 704; *McPherson v. Foster,* 43 Iowa 48; *City of Bryan v. Page,* 51 Tex. 532.

It was also argued that the city, by paying a portion of the agreed discount on its warrants, ratified the agreement to pay the difference between the face of the warrants and their market value in cash, and was estopped from asserting the invalidity of the contract. The court having held that the agreement to pay in cash the amount of the discount was illegal, it necessarily followed that the illegal contract was incapable of ratification.

Consideration of the language used by the court, as above quoted, in connection with the facts of the case upon which the opinion was written, indicates clearly

that the decision is not controlling in the case at bar. The ratification relied upon by Mr. Arnott was a ratification by conduct or the acceptance of benefits. No formal ratification of the agreement between Mr. Arnott and the city of Spokane was ever even attempted by the city council or any other officer or board having authority to bind the city. Plaintiff sought recovery against the city upon a manifestly illegal agreement; one that was unlawful, not only because of the manner in which it was made, but because it was inherently void as against public policy. The court, therefore, in part at least, held that the contract which the city officials attempted to make with Mr. Arnott was void because of a want of power in the city to make such an agreement.

In the case at bar the difficulty arises, not from any want of power on the part of the voters of the city of Centralia to authorize the acquisition of a power plant, but from failure to comply with the restrictions imposed "by the legislature with reference to the mode of exercising such power." It must always be remembered that the people, by a majority vote cast at a valid election, have authority to authorize precisely the acts which were, in this instance, performed by respondent city commissioners. The commissioners, in carrying out the mandate of the voters, are simply the agents of the people. The authority comes from the people, and not from the commissioners. Contracts signed pursuant to such a mandate are contracts of the city thereunto authorized by the electors, and not the contracts of the city acting merely by and through its city commission. In the exercise of these powers, both the city, acting through its electors, and, on the other hand, acting through its governmental machinery as established by its charter, are bound by the constitution and the laws of the state enacted pur-

suant thereto; and, as in the case at bar, where the procedure followed has not been in accordance with law, proceedings had thereunder must be held void; but this nowise precludes the ultimate municipal authority, wherever that may rest under the law in any particular case, from again exercising in a lawful manner its authority for the purpose of correcting errors and mistakes due, not to a basic want of power, but to defective procedure which has, in some respects, caused the municipal machinery to cease to function. Granted that,

"The power to ratify a particular contract presupposes the power to make it in the first instance; and if it is such that it could not be made originally except in a certain prescribed mode, where that mode is disregarded the power to ratify does not exist. A contract which is invalid because not authorized by law cannot be made valid and binding retroactively by any subsequent action of the corporate body, and a liability be thereby fastened upon the corporation,"

as stated by the court in the *Arnott* case, *supra,* it cannot be disputed that, in this case, the power to direct the construction of the power plant was in this instance undoubtedly vested in the electors of the city, and the voters, by their ballots cast at the second election, which, at least in so far as the procedure leading up thereto is concerned, was valid, again issued their mandate to their city commissioners directing the acquisition of the plant. The language quoted from the *Arnott* case must be considered in view of the facts of that case, where it was contended that the city officials had, by their acts, raised an estoppel against the city which prevented the city from asserting the basic illegality of the contract, which, as a matter of fact, had not been directly ratified by anybody. The proposition upon which that case was de-

termined is concisely stated in the last sentence of the quotation, in which the doctrine is laid down that a contract, *invalid because not authorized by law,* cannot be ratified.

We cannot subscribe to the doctrine advocated by appellant to the effect that a municipality which votes to do a thing which it may lawfully accomplish may, merely because the procedure followed is defective, find itself bogged down in an impassable morass, from which it cannot escape by going either forward or backward. The case cited is not determinative of the questions here presented.

In the case of *Chehalis County v. Hutcheson,* 21 Wash. 82, 57 Pac. 341, 75 Am. St. 818, this court held that, in view of the provision of the state constitution to the effect that the legislature shall fix the salaries of all county officers (with certain exceptions not important to the consideration of the question presented), a statute providing that a county superintendent of schools should receive compensation at the rate of $3 for each school visited was unconstitutional and void, and that a board of county commissioners had no authority to contract with a county superintendent that he should receive $3 for each school visited, and that a claim based upon such an agreement was invalid. As the board of county commissioners had no authority whatsoever to make the agreement which it attempted to make with the superintendent of schools, the contract was absolutely void *ab initio,* and no estoppel could operate against the county by reason of the fact that the visits were made after the agreement. This case simply holds that no inherently void contract, void by want of a constitutional or legal authority to make the contract, can be made the basis of an estoppel against a municipal corporation.

This case is not in point upon the questions here presented.

This court, in the case of *State v. Pullman,* 23 Wash. 583, 63 Pac. 265, 83 Am. St. 836, held *ultra vires* a contract by the city to purchase water pipe which had been laid by the state outside of the city limits, the city having no authority to contract for the erection, etc., of public works in an amount exceeding $100, or to contract for the extension of its water system whereby an indebtedness should be created, without authority of the voters of the city. The state of Washington had agreed to sell to the city water piping which had been laid outside the city limits, the state bringing suit to enforce the contract, the same was held *ultra vires* and void, and the fact that the city had received the benefits of the contract did not estop the city from later asserting the invalidity of the agreement. The court said:

"It is well established that the power to ratify is co-extensive only with the power to contract, and that an act which was illegal for want of authority on the part of the contracting powers cannot be ratified."

This language was used in connection with the contention of the state that the city was estopped by conduct from denying the validity of the contract by reason of the fact that it had accepted the benefits thereof. The court distinguishes those cases in which it was held that a municipality was proceeding absolutely without authority from those in which it appeared that a city was proceeding within its powers, but in an irregular manner.

In the case at bar, it is, of course, admitted that the electors of respondent city had the right, if exercised at an election called in the manner provided by law, to authorize the city commissioners to do the things which the voters of the city attempted to authorize

them to do in the election which this court held void in the case of *Dunn v. Centralia, supra.* The case at bar involves, not an attempted ratification of acts essentially and inherently *ultra vires,* but of acts which were void because the city authorities proceeded irregularly and without actual authority due to an error in the calling of the election. In the case last cited, it was held that, as the officers of the city had no power to enter into the contract, such power being vested solely in the voters of the city, the city officials had authority only to put in motion machinery which would elicit an expression of the will of the voters in whom was vested the discretion and authority to direct the action of the city. This discretion and authority not having been exercised, the contract was held void.

In the case of *State ex rel. Spring Water Co. v. Town of Monroe,* 40 Wash. 545, 82 Pac. 888, this court again held that the plea of estoppel cannot be urged against the defense of *ultra vires,* and that a water company which had expended money, relying upon a franchise granted by public officers who had no power to grant the same, cannot claim ratification and recover judgment against the municipality upon that basis. Relator accepted a franchise granted by the board of county commissioners authorizing it to lay water pipes. The board had no authority whatsoever to grant such a franchise, and the court held that no plea of ratification or estoppel could prevail against the defense of *ultra vires.* The court distinguishes the case from that of *Spokane Street R. Co. v. Spokane Falls,* 6 Wash. 521, 33 Pac. 1072, in which case it appeared that the city council had in the first instance the power to grant the franchise there in controversy. The court, referring to the *Spokane* case, says:

"It was a case of the defective or irregular exercise of an existing power, and not a case where the power to act in the first instance was entirely lacking."

In the case at bar, while the city commissioners had no power in law to act under the void election, the authority of the city commissioners must not be confused with the authority of the voters of the city, who did have, under the law, complete power and authority to direct the city officials to proceed to erect the power plant which is the subject-matter of the litigation now before us.

Appellant next cites the case of *State ex rel. Craig v. Newport,* 70 Wash. 286, 126 Pac. 637, in which it was held that the town authorities having no authority to provide for a municipal water system without submission of the plan or system to the electors, the action of the town officers in leasing property to be used for that purpose, without submitting the matter to a vote, was *ultra vires,* and that the acceptance by the town of the benefits of the contract did not constitute such a ratification thereof as would estop the city from disputing the indebtedness illegally attempted to be incurred by the lease. This again is another instance of acts by the officials of a town which were wholly *ultra vires* and beyond their power. The court held the lease void *ab initio,* no election having ever been called at which the electors were afforded an opportunity of authorizing the execution thereof by the city officers.

The opinion of this court in the case of *Osborne, Tremper & Co. v. King County,* 76 Wash. 277, 136 Pac. 138, is to the same effect.

It will be noted that, in all these cases, which we have discussed at length, as they are insistently relied upon by appellant, authority to enter into a contract was usurped by municipal officers, who had absolutely

no vestige of authority to enter into the agreement by which they sought to bind the municipality. In none of the cases was there any question of actual power irregularly exercised. This distinction running through all the cases deprives them of authority in the case at bar.

Appellant also relies upon the case of *Hansard v. Green,* 54 Wash. 161, 103 Pac. 40, 132 Am. St. 1107, 24 L. R. A. (N. S.) 1273. In this case, it appeared that the electors of the town of Harrington had voted to purchase a water system and to issue bonds for the payment of the purchase price; that, after the election, the owner of the existing water system conveyed the same to the town, which entered into possession thereof, three men, who later intervened in the action, advancing the purchase price to the owner of the water system, the town agreeing to deliver to the interveners $22,000 in bonds, when the same should be executed, in payment of the money advanced by the interveners to the owner of the plant. The action was brought to restrain the delivery of the bonds to the interveners. The town defaulted and the interveners alone defended. This court held that there was no rule of law "which permits a municipal corporation to contract a debt upon an agreement to issue bonds to cover it;" that the right and duty rested upon the corporate authority to sell the bonds in such manner as they should deem for the best interest of the town; and that the courts had no right to control, by judicial decree, the acts of the corporate authorities. This decision is authority for the proposition that a municipality cannot contract to dispose of a series of bonds in advance of its issue, and deliver the bonds pursuant to such contract, over the challenge of a taxpayer.

"The bond must be in existence before it can be delivered or become an object of barter and sale. . . .

To hold that a party advancing money at the request of the officers of a municipal corporation, upon their promise to reimburse the creditor by an issue of its negotiable bonds, can acquire a right of action would defeat both the purpose and spirit of the law."

In the case cited, the electors of the town of Harrington voted to acquire the water works, but the agreement concerning the delivery of the bonds was made only by the municipal authorities. No question was urged as to the invalidity of the purchase of the water system by the town, and we do not find the case controlling upon any of the questions urged by appellant.

Respondents argue that, in so far as acts on the part of the municipality, without or beyond the power or authority conferred by law, are concerned, such acts fall, generally speaking, into two classes: those which are primarily, and those which are secondarily, *ultra vires*. In the first classification, belong such acts as a municipality has no authority whatsoever to perform; in the second classification, fall those which are within the lawful powers of the municipal corporation, but which are void because of some irregularity in the procedure leading up to the act. *Bell v. Kirkland,* 102 Minn. 213, 113 N. W. 271. This distinction was recognized by this court in the case of *State v. Pullman, supra,* quoted with approval in the later case of *State ex rel. Spring Water Co. v. Town of Monroe, supra:*

"It is claimed, however, by the appellant, that, having received the benefits of the contract which the city entered into, it ought to be estopped from denying its validity; also that it had ratified the contract by receiving the benefits. It is well established that the power to ratify is coextensive only with the power to contract, and that an act which was illegal for want of authority on the part of the contracting powers

cannot be ratified. There has been a conflict of opinion on some branches of this question, but an investigation of the authorities will show, we think that where courts have estopped municipalities from interposing the plea of *ultra vires,* and from escaping the responsibility of their acts, it has been where there has been a defect in the execution of the contracts, as in the issuance of bonds, etc., and not where there has been an absolute want of power on the part of the municipality to contract.''

This distinction was also recognized in the case of *Spokane Street R. Co. v. Spokane Falls,* 6 Wash. 521, 33 Pac. 1072, in which this court held good, as against a demurrer, a complaint on the part of a street railway company in which it alleged that the city had granted to its assignor a franchise to operate a street railway upon designated streets, and that, under the direction of the city superintendent of streets, a portion of the track was laid upon a street not covered by the franchise, the city later, through its city council, requiring plaintiff to remove its track from the street over which it lacked any franchise to operate. The city, of course, had the right originally to grant the franchise, and it was held that the complaint of the street railway company stated a good cause of action in seeking to restrain the city from requiring the removal of the tracks. As observed by Judge Rudkin, in the case of *State ex rel. Spring Water Co. v. Monroe, supra,* the city of Spokane had the power to grant the franchise, and the situation resulted from ''the defective or irregular exercise of an existing power, and not a case where the power to act in the first instance was entirely lacking.''

The right to authorize the acquisition of an electric power plant is vested by law in the electors of a city, and not in the city government as established by charter. While laws vesting municipal corpora-

tions with statutory powers must be construed by the courts in such manner as to prevent municipal corporations from exercising powers not conferred upon them by law, courts should not, on the other hand, be overly technical in determining just how and by what means municipalities shall exercise powers undoubtedly vested in them by statute. Unfortunately, mistakes in carrying out the procedure outlined by statute will occur, and such mistakes carry with them their own penalties, which are often severe and the cause of much useless trouble and expense. The evils which necessarily follow in the train of such errors would seem sufficient to insure carefulness in the future, without such action by the courts as will worse confound the existing confusion.

When consistent with a reasonable construction of applicable laws, the action of the voters of a municipality, validating or ratifying prior unlawful acts of the municipal officials performed either by mandate of the voters or through the regularly chosen officers of the corporation, should be upheld. This principle finds support in the following decisions of this court: *Williams v. Shoudy,* 12 Wash. 362, 41 Pac. 169; *West v. Chehalis,* 12 Wash. 369, 41 Pac. 171, 50 Am. St. 896; *Nichols v. School District,* 39 Wash. 137, 81 Pac. 325; *Pilling v. Everett,* 67 Wash. 109, 120 Pac. 873; *Ettor v. Tacoma,* 77 Wash. 267, 137 Pac. 820.

The following decisions from other jurisdictions are also in point: *Swenson v. Bird Island,* 93 Minn. 336, 101 N. W. 495; *Iverson v. Williams School District,* 42 N. D. 622, 172 N. W. 818; *City of St. Louis v. Schoenemann,* 52 Mo. 348; *Murphy v. Paull,* 192 Wis. 93, 212 N. W. 402; *State ex rel. Tekamah v. Marsh,* 108 Neb. 835, 189 N. W. 381; *McGillivray v. Joint School District,* 112 Wis. 354, 88 N. W. 310; *Haney*

221

*School Furniture Co. v. School District No. 1,* 133 Mich. 241, 94 N. W. 726.

By the election of September 30, 1929, the electors of respondent city authorized the establishment of the hydro-electric power plant, the diversion dam to be used therewith, and kindred constructions, together with the issuance of bonds in the sum of $650,000, payable from the revenues of the light and power system to be used *pro tanto* in paying for the plant.

We conclude that this election was in all respects regular and in accord with the law governing such elections; that the above mentioned bond issue voted by the people is valid; and that the record before us contains nothing which warrants the granting of any relief to appellant in connection with matters contained in the first cause of action set forth in his complaint.

In his second cause of action, appellant seeks judgment requiring restoration to the city treasury of funds paid out therefrom by the city commissioners in carrying out the mandate of the voters, as expressed in the first and void election, the money having been disbursed out of the fund into which had gone the profits from the city's electric current distribution system. In the second cause of action, appellant also asks other relief, which will be the subject of later discussion in this opinion.

From the record herein, we are satisfied that the disbursements made by the city, which appellant seeks to have restored to the city treasury, were made and received by the respective parties in good faith, and that the reasonable value of the respective considerations moving to the city therefor equaled the respective sums paid to the different parties who had entered into contracts for the furnishing of property, labor or material to the city. Under these circum-

stances, we find no ground for directing that the city treasury be reimbursed for any of the money so expended. This court has repeatedly held that public corporations must observe the same rules of honesty and fair dealing that are required of private individuals. *State ex rel. Maddaugh v. Ritter,* 74 Wash. 649, 134 Pac. 492; *State ex rel. Washington Paving Co. v. Clausen,* 90 Wash. 450, 156 Pac. 554, L. R. A. 1917A 436; *Olympia Brewing Co. v. State,* 102 Wash. 494, 173 Pac. 430.

We have also held that, when a municipal corporation has accepted benefits under a contract, it is estopped from denying liability thereon. *Franklin County v. Carstens,* 68 Wash. 176, 122 Pac. 999; *Mallory v. Olympia,* 83 Wash. 499, 145 Pac. 627. The rule here laid down is, of course, subject to other rules, but in view of our opinion concerning the merits of this controversy, as hereinabove expressed, the doctrine has some application to the case at bar.

More important decisions of this court are those in which it has been held that, when labor has been performed and material furnished in good faith under a contract with a municipal corporation, and such contract, by reason of some mistake in procedure, is void, the person furnishing the labor or material is entitled to retain money which has been paid him, under the doctrine of *quantum meruit,* in an amount equal in value to the service which he has performed.

In the case of *Green v. Okanogan County,* 60 Wash. 309, 111 Pac. 226, it appeared that the county commissioners had let a contract for the construction of a bridge under such circumstances that the contract was void. The action was brought after the contract had been let, but before it was signed, for the purpose of enjoining its execution. The trial court dismissed the action, and thereupon the county commissioners pro-

ceeded to let the contract and the contractor proceeded to construct the bridge, which was completed and accepted by the county. The plaintiff appealed to this court, and, in due time, the respondents moved to dismiss the appeal and made a showing in this court by affidavits to the effect that the contract had, after the trial, been executed and the bridge constructed in accordance therewith. This court denied the motion to dismiss the appeal and reversed the judgment appealed from, holding that the contract had been irregularly entered into and was void. The court, however, refused to direct the respondents to return to the county treasury the money which had been paid for the bridge, holding that, since the county had accepted the bridge, it was liable to the builders for its reasonable value, and was entitled to recover only the difference between the reasonable value of the bridge and the amount paid therefor under the contract. The trial court was directed to determine the reasonable value of the bridge and take an accounting of the moneys paid out therefor.

In the later case of *Besoloff v. Whatcom County,* 133 Wash. 109, 233 Pac. 284, this court held good, as against a demurrer, a complaint in which it was alleged that the plaintiff had entered into a contract with the county commissioners for the improvement of a highway; that, when the work was commenced, natural conditions were encountered, not contemplated by the contract, rendering the work more costly, concerning which an oral agreement was made, under which the plaintiff proceeded with the work. After completion and acceptance of the road, the county refused to pay an additional amount claimed to be due under the oral agreement. This court held that the facts alleged showed that the plaintiff was entitled

to recover the compensation which he sought for the extra labor performed under the void oral contract.

This doctrine also finds support in the decisions of this court in the cases of *Criswell v. Directors of School District No. 24*, 34 Wash. 420, 75 Pac. 984; *Strong & MacDonald v. King County*, 147 Wash. 678, 267 Pac. 436; *O'Connor v. Murray*, 152 Wash. 519, 278 Pac. 176.

Under these authorities, we hold that the record before us shows no right in appellant to a judgment directing the return to the city treasury of moneys paid by the city commissioners as above stated.

This leaves for discussion the matter of certain alleged expenditures by respondent commissioners in alleged propaganda concerning the election, and in bringing to the notice of the voters certain data bearing upon the situation in regard to the proposed power plant. In this connection, Rem. Comp. Stat., § 9958, which reads as follows, must be considered:

"The state auditor, a deputy state inspector and supervisor, and every state examiner shall have power by himself or by any person legally appointed to perform the service, to examine into all financial affairs of every public office and officer; such examination of the financial affairs of townships, incorporated cities and towns and school districts shall be made at least once in every two years; all other examinations shall be made at least once a year. On every such examination inquiry shall be made as to the financial condition and resources of the taxing district; whether the Constitution and statutory laws of the state, the ordinances and orders of the taxing district and the requirements of the bureau of inspection and supervision of public offices have been properly complied with; and into the methods and accuracy of the accounts and reports. The state auditor, his deputies, every state examiner and every person legally appointed to perform such service, shall have and may exercise the necessary authority to issue subpoenas

and compulsory process and to direct the service thereof by any constable or sheriff, to compel the attendance of witnesses and the production of books and papers before him at any designated time and place and to administer oaths. Where any person summoned to appear before the person making such examination and give testimony, shall neglect or refuse to appear, or shall neglect or refuse to answer any question that may be put to him touching any matter under examination, or to produce any books or papers required, the person making such examination shall apply to a superior judge of the proper county to issue a subpoena for the appearance of such person before him; and it shall be the duty of such superior judge to order the issuing of such subpoenas for the appearance of such person forthwith before him to give testimony; and if any person so summoned shall fail to appear or appearing shall refuse to testify or to produce any books or papers required, he shall be subject to like proceedings and penalties for contempt as witnesses in actions pending in the superior court. Willful false swearing in any such examination shall be perjury and shall be punishable as such. A report of such examination shall be made in triplicate, one copy to be filed in the office of the state auditor, one in the auditing department of the taxing district reported upon, and one in the office of the attorney general. If any such examination discloses malfeasance, misfeasance or nonfeasance in office on the part of any public officer or employee, within thirty days from the receipt of such copy of said report, it shall be the duty of the attorney general and he is hereby authorized to institute and prosecute without delay in the proper county such legal action as is proper in the premises by civil process and promptly and efficiently prosecute the same to final determination to carry into effect the findings of any such examination. Before or after such legal action is commenced it shall not be lawful for the county commissioners or any board or officer to make a settlement or compromise of any claim arising out of such malfeasance, misfeasance or nonfeasance or any action commenced there-

for or for any court to enter up any compromise or settlement of such action, without the written approval and consent of the attorney general and the state auditor.''

The procedure outlined by this section seems to have been followed by the *Attorney General* in instituting the cases of *Port of Seattle ex rel. Dunbar v. Lamping,* 135 Wash. 569, 238 Pac. 615, and *Seattle ex rel. Dunbar v. Dutton,* 147 Wash. 224, 265 Pac. 729, and we hold that, at least until the attorney general refuses to act, no right of action for the recovery of funds improperly expended by a public official under the circumstances above referred to exists in favor of an individual taxpayer. Whether or not such an action could be maintained by the municipality itself in its own name, or whether a taxpayer could maintain mandamus to compel action by the attorney general, we do not now decide.

Appellant offered testimony to the effect that the proposed power plant would yield power far in excess of the present needs of the city of Centralia, and that no ground exists for anticipating that the city will, within any reasonable time, enjoy such an increase of population that a plant of the capacity of the proposed plant will be necessary. The trial court refused to receive the evidence offered, upon which refusal appellant assigns error.

Granting that, under the statutes of this state authorizing the construction by a municipality of a power plant and system, the courts would restrain the construction of an unreasonably large plant or one for any reason entirely inappropriate to the service for which it may lawfully be designed, we find no sufficient ground in the record for interfering with the judgment of the city authorities as exercised by them in connection with the proposed power plant, and, as-

suming, for the purposes of this opinion, that the testimony offered by appellant had been received, we find therein no ground for reversing the judgment of the trial court.

Other questions are argued, but, in view of our conclusions as above expressed, we do not find that further discussion is required.

Believing that the ruling of the trial court, directing the dismissal of appellant's action, was correct, the judgment of dismissal is affirmed.

MITCHELL, C. J., TOLMAN, MAIN, MILLARD, PARKER, and HOLCOMB, JJ., concur.

FRENCH, J., concurs in the result.